IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE COOKSEY, | ) | CASE NO. 1:17-cv-01378 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Michelle Cooksey ("Plaintiff" or "Cooksey") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate

Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I.  Procedural History

Cooksey protectively filed her application for DIB on April 27, 2015.[1]  Tr. 615, 687, 688,

708, 784-785.  She alleged a disability onset date of October 8, 2014, (Tr. 615, 688, 708, 784,

821), and alleged disability due to back pain, left knee pain, carpal tunnel, depression, anxiety,

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about
filing for benefits. It may be used to establish an earlier application date than when we receive your signed
application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 6/5/2018).

panic attacks, and insomnia (Tr. 688, 708, 725, 729, 812, 820).  After initial denial by the state

agency (Tr. 724-727) and denial upon reconsideration (Tr. 729-732), Cooksey requested a

hearing (Tr. 734-748).  A hearing was held before Administrative Law Judge George D. Roscoe

("ALJ") on February 16, 2017.  Tr. 644-686.

In his March 6, 2017, decision (Tr. 612-641), the ALJ determined that Cooksey had not

been under a disability within the meaning of the Social Security Act from October 8, 2014,

through the date of the decision (Tr. 616, 637).  Cooksey requested review of the ALJ's decision

by the Appeals Council.  Tr. 782-783.  On June 9, 2017, the Appeals Council denied Cooksey's

request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence

### A.      Personal, educational, and vocational evidence

Cooksey was born in 1967.  Tr. 636, 648, 784.  At the time of the hearing, Cooksey was

residing with her husband and three children.  Tr. 647.  Cooksey and her husband had been

separated but were in the process of trying to reconcile.  Tr. 647.  Cooksey has an associate's

degree in business from Sawyer Business College.  Tr. 649.  Cooksey worked for a bank in

various positions until May 2014.  Tr. 649-650, 684.  Cooksey ended up leaving her bank job

because of the way she was being treated due to her anxiety.  Tr. 652, 665.  After she left the

bank, she started a home daycare business.  Tr. 665.  She had two or three children in her care at

a time.  Tr. 665.  Most recently, in late 2016, Cooksey worked a seasonal part-time job at Pat

Catan's, a craft store.  Tr. 667-668.  And she worked briefly at an aftercare child program at a

YMCA.  Tr. 669.  She could not handle the position and started having panic attacks.  Tr. 668.

She lasted at that position for about a month.  Tr. 668-700.

2

**B.**      **Medical evidence**

1.      **Treatment records**[2]

In March 2014, Cooksey saw her primary care physician James E. Misak, M.D., with complaints of hypertension, hypothyroidism, obesity, and adjustment disorder with depressed mood.  Tr. 1073.  Other noted problems were Vitamin D deficiency, restless leg syndrome, and mild persistent asthma.  Tr. 1073.  Cooksey relayed difficulties with her marriage, noting that her husband was disabled due to chronic pain and he was disrupting her while she was at work, which was affecting her job evaluation.  Tr. 1073.  She was taking sertraline[3] but indicated it was not very helpful.  Tr. 1073.  Cooksey was feeling very tense all the time and very anxious.  Tr. 1073.  Dr. Misak continued Cooksey on sertraline, added buspirone, and recommended counseling.  Tr. 1075.

On April 3, 2014, upon Dr. Misak's referral, Cooksey met with Benjamin Rubin, LSW, for suspected adjustment disorder with anxiety and depression.  Tr. 1061.  Cooksey explained she was spending a lot of time taking care of her husband due to his health conditions.  Tr. 1062.  She was having panic attacks, including while at work, and she was losing focus at work.  Tr. 1062.  She was working at a bank and was informed that she needed to get help or would have to take leave at work.  Tr. 1062.  She reported worrying all the time, having difficulty

---

[2] Cooksey's medical evidence summary includes records submitted to the Appeals Council after the ALJ issued his decision. Doc. 12, p. 10. Evidence submitted after the ALJ's decision "cannot be considered part of the record for the purposes of substantial evidence review."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir 2001) (citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir 1996)).  Under 42 U.S.C § 405(g) additional evidence submitted to the Appeals Council can be a basis for sentence six remand if there is a showing that the evidence is new, material, and that there was good cause for failing to present the evidence at the hearing.  *Cotton v. Sullivan*, 2 F.3d 692, 695 (6th Cir 1993).  Here, Cooksey does not present a sentence six remand argument.

[3] Sertraline is the generic name for Zoloft.  *See https://www.webmd.com/drugs/2/drug-35-8095/zoloft-oral/sertraline-oral/details* (last visited 6/5/2018)

concentrating, and having increased anxiety and irritability.  Tr. 1062.  Cooksey was taking some of her husband's Vicodin to decrease her anxiety.  Tr. 1062.  Cooksey had no history of inpatient treatment and last saw a therapist in December 2013.  Tr. 1062.  On examination. Mr. Rubin observed that Cooksey was well groomed; cooperative; oriented to time, person and place; her speech was clear and her thought process was logical; she had no abnormal thoughts; her judgment and insight were good; her recent and remote memory recall was good; she had sustained attention and concentration; her fund of knowledge was okay; her mood was depressed and anxious; and her affect was mood-congruent.  Tr. 1064.  Mr. Rubin diagnosed Cooksey with major depressive disorder, single episode; generalized anxiety disorder; panic disorder without agoraphobia; eating disorder, unspecified; and opiate abuse, provisional.  Tr. 1065.  Mr. Rubin recommended medication treatment and psychotherapy.  Tr. 1065.

A few days later, on April 9, 2014, Cooksey saw Leanne Hardy for behavioral health counseling and therapy.  Tr. 1055-1057.  Cooksey relayed she had received a bad review at work in February 2014 and felt like her job was in jeopardy.  Tr. 1055.  Spending time with her children, sewing, and crocheting helped Cooksey decrease her racing thoughts.  Tr. 1056. Cooksey saw Ms. Hardy on April 24, 2014.  Tr. 1050-1051.  Cooksey relayed that she had taken a week off from work and her anxiety significantly decreased since their last session.  Tr. 1050. By Thursday, however, she started feeling anxious about returning to work.  Tr. 1050.  While at work she worried about home, primarily her husband.  Tr. 1050.  She indicated that her husband was manipulative and she worried about how he got along with her sons, the babies and her five-year old.  Tr. 1050.

Cooksey saw Dr. Misak on May 16, 2014.  Tr. 1048-1049.  With regard to her adjustment disorder and mixed anxiety and depressed mood, Cooksey reported feeling much better.  Tr.

4

1048.  She decided to quit her job and start a home daycare business.  Tr. 1048.  Cooksey's husband supported her plan and she indicated he had been less manipulative.  Tr. 1048.  She was continuing to take sertraline.  Tr. 1048.  She had tried alprazolam but found it too sedating and buspirone caused agitation.  Tr. 1048.  Cooksey relayed that she had taken a clonazepam[4] that a friend had and it provided her great relief from her anxiety with no sedation.  Tr. 1048.  Cooksey requested and Dr. Misak provided her with a prescription for clonazepam.  Tr. 1048.  Dr. Misak also continued Cooksey on sertraline.  Tr. 1048.  Dr. Misak noted a mild exacerbation of Cooksey's asthma.  Tr. 1048.  Cooksey had prednisone at home and was advised to call with the dose.  Tr. 1048.

During an August 26, 2014, visit with Mr. Misak, Cooksey complained of having more low back pain, noting that she was doing home day care and was very active.  Tr. 1034.  She also complained that medication was not helping with her restless leg syndrome.  Tr. 1034.  Dr. Misak prescribed diclofenac and gabapentin[5] for her back pain and he increased her dose of ropinrole for her restless leg syndrome.  Tr. 1035.  Also, for Cooksey's back pain complaints, Dr. Misak ordered x-rays.  Tr. 1035.  Dr. Misak noted that Cooksey's hypertension and mild persistent asthma were controlled.  Tr. 1034.

An x-ray of Cooksey's spine was taken on August 27, 2014.  Tr. 1086-1087.  The x-ray showed multi-level degenerative changes with facet arthropathy at the L4-L5 and L5-S1 levels; moderate to severe disc space narrowing at the L3-L4 levels; and mild chronic loss of height at the T12 vertebral body.  Tr. 1086.

---

[4] Clonazepam is the generic name for Klonopin.  *See https://www.webmd.com/drugs/2/drug-14403-6006/clonazepam-oral/clonazepam-oral/details* (last visited 6/5/2018).

[5] Gabapentin is the generic name for Neurontin.  *See https://www.webmd.com/drugs/2/drug-9845-8217/neurontin-oral/gabapentin-oral/details* (last visited 6/5/2018).

On October 8, 2014, Cooksey was involved in a motor vehicle accident.  Tr. 941.  She was treated at the emergency room with complaints of low back pain.  Tr. 941-951, 1077-1080. Cooksey was struck by another motor vehicle from behind.  Tr. 943, 1077.  Cooksey complained of low back pain that she described as moderate in severity and worse with palpation, movement or walking.  Tr. 943, 1077.  On examination of her back, Cooksey exhibited bilateral trapezius tenderness, right greater than the left, and upper lumbar down paraspinal tenderness bilaterally. Tr. 945, 1079.  Cooksey's musculoskeletal examination revealed full range of motion in all extremities by left brachioradialis tenderness to palpation.  Tr. 945, 1079.  Cooksey's neurological examination showed equal strength in her bilateral upper and lower extremities.  Tr. 945, 1079.  The impression on discharge was lumbar strain, cervical strain, and left forearm contusion.  Tr. 946, 1079.  Cooksey was discharged in stable condition.  Tr. 946, 1079.

Following the motor vehicle accident, beginning on October 14, 2014, and continuing through April 15, 2015, Cooksey received treatment from Dr. Stephen Ross Bernie, M.D., at the Medical Care Group for complaints of cervical and lumbar pain and post-concussive symptoms. Tr. 626, 953-959, 1010.  Cooksey was also having problems with her left knee.  Tr. 955.  She reported that she was dropping things, having increased sleep apnea, and having more frequent memory problems.  Tr. 954, 956.  Also, Cooksey attended physical therapy sessions at the Medical Care Group during that time period.  Tr. 960-991.  A TENS unit was recommended for use at home.  Tr. 962, 969, 971.

Cooksey also continued to treat with Dr. Misak after the accident. Tr. 1017-1020.  On October 31, 2014, Cooksey relayed that she was having much greater back pain since her accident.  Tr. 1017.  Another doctor that Cooksey had seen following her accident had prescribed

Vicodin.  Tr. 1017.  That doctor advised Cooksey that he preferred that Dr. Misak manage her pain medication.  Tr. 1017.

On November 14, 2014, Cooksey saw Harold Mars, M.D., for a neurological consultation.  Tr. 1093-1096.  Cooksey complained of "twitching nerves," neck, shoulder, arm, back and leg pain, headaches, and vision problems.  Tr. 1093.  She relayed that her health had been stable until the car accident on October 8, 2014.  Tr. 1093.  Cooksey also indicated that she was feeling very depressed.  Tr. 1094.  On examination, Cooksey's recent and remote memory were intact, her attention span and ability to concentrate were normal, and her fund of knowledge was normal.  Tr. 1095.  Cooksey's strength in her arms and legs was intact and her sensation to light touch and pin prick on arms and legs was normal.  Tr. 1095.  Dr. Mars noted that some tightness and tenderness was present in the posterior cervical and lumbosacral parapspinous areas.  Tr. 1096.  Dr. Mars diagnosed cervical and lumbosacral myofascitis, post-concussive syndrome.  Tr. 1096.  Dr. Mars ordered MRI scans of the cervical and lumbar spines, an electromyography of the upper extremities and an electroencephalography.  Tr. 1096.

Cervical and lumbar MRIs were taken on November 24, 2014.  Tr. 1097-1099.  The cervical MRI showed 1-2 mm disc herniations at four levels: C3-4, C4-5, C5-6, and C6-7.  Tr. 1097-1098.  The lumbar MRI showed no evidence of disc herniation or spinal canal stenosis but disc dehydration and disc bulges were present, involving L3-L4 and L5-S1.  Tr. 1099.   On November 26, 2014, Cooksey underwent nerve conduction studies.  Tr. 1107-1108.  The electromyography report showed bilateral median neuropathies at or distal to the wrist, consistent with carpal tunnel syndrome; slow conduction velocity was present bilaterally; and no evidence of an acute radiculopathy.  Tr. 1108.

Cooksey saw Dr. Mars for a follow-up appointment on November 26, 2014.  Tr. 1100-1101.  Cooksey relayed that, since the accident, her carpal tunnel symptoms had worsened.  Tr. 1100.  Dr. Mars noted that the electromyogram demonstrated bilateral carpal tunnel syndrome.  Tr. 1100. Cooksey indicated that her neck pain was improving but her back pain was persisting.  Tr. 1100.  On examination, Dr. Mars found that Cooksey's musculoskeletal strength, gait, cognition, peripheral sensation, and deep tendon reflexes were normal.  Tr. 1100.  There was tightness present in the paraspinous musculature.  Tr. 1100.

Cooksey underwent a sleep study on December 8, 2014.  Tr. 1514-1518.  The polysomnogram showed moderate obstructive sleep apnea syndrome.  Tr. 1514, 1517.  On January 3, 2015, Cooksey had an MRI of her left knee which showed moderate knee joint effusion and a tear of the posterior horn of the medial meniscus.  Tr. 1103.

Cooksey saw Dr. Misak on February 24, 2015.  Tr. 1009-1011.  Dr. Misak noted that a titration study was needed for Cooksey's obstructive sleep apnea.  Tr. 1010.  Dr. Bernie was treating Cooksey's knee pain and lumbar issues but Dr. Misak was responsible for prescribing pain medications.  Tr. 1011.  For her carpal tunnel syndrome, Dr. Misak advised Cooksey to continue to use her bilateral wrist splints.  Tr. 1011.

On March 2, 2015, Cooksey saw Dr. Mars for follow up.  Tr. 1109-1110.  Cooksey's chief complaint was "myofascitis, carpal tunnel syndrome[.]"  Tr. 1109.  Cooksey's pain was variable.  Tr. 1109.  A month earlier, she had fallen on her left knee.  Tr. 1109.  Dr. Mars noted that a prior MRI of the knee showed a torn meniscus.  Tr. 1109.  On examination, Dr. Mars observed normal musculoskeletal strength, gait, peripheral sensation and deep tendon reflexes.  Tr. 1109.  Cooksey was scheduled to see an orthopedist.  Tr. 1110.

On April 16, 2015, Cooksey was seen at a MetroHealth express care clinic for her back following a fall that occurred two days earlier.  Tr. 1001-1003.  Cooksey stepped in a pothole and fall on to her buttocks.  Tr. 1002.  She had not slept for two nights.  Tr. 1002.  She had pain medication at home but was interested in muscle relaxers.  Tr. 1002.  The pain was radiating down her left leg.  Tr. 1002.  An examination revealed limited range of motion due to pain and tenderness in her back but no spasms.  Tr. 1002.  Cooksey was prescribed Flexeril.  Tr. 1002, 1251.  When Cooksey saw Dr. Misak on April 21, 2015, for follow up, Cooksey reported feeling no better with the Flexeril.  Tr. 1251.  She reported using her current medication and a TENS unit with some relief.  Tr. 1251.  On examination, Dr. Misak observed that Cooksey appeared to be in pain.  Tr. 1252.  She had focal tenderness to palpation in her right lumbar paraspinous region with focal muscle spasm in that area.  Tr. 1252.  Straight leg raise was negative bilaterally; sensation and strength in the lower extremities was intact; and her gait was normal.  Tr. 1252.  Dr. Misak added Lidocaine patches to Cooksey's treatment and recommended that she use the TENS unit frequently.  Tr. 1252.  Cooksey declined a physical therapy referral.  Tr. 1252.

On May 7, 2015, Cooksey sought treatment at the express care clinic for an injury to her forearm which occurred while she was breaking up her two dogs that were fighting.  Tr. 996.  Cooksey had no bleeding but some cuts/scratches and bruising on her left forearm and some bruising to her wrist and thumb area.  Tr. 998.  On examination, Cooksey had full range of motion, equal strength, and intact sensation in her upper extremities.  Tr. 998.

Cooksey saw Dr. Misak on July 7, 2015.  Tr. 1281.  She continued to complain of back pain.  Tr. 1281.  She was using a TENS units, Lidocaine patches and her other medications.  Tr. 1281.  Dr. Misak recommended a physical therapy evaluation.  Tr. 1281.  She complained of feeling very stressed and was having frequent crying spells and was interested in seeing a

therapist.  Tr. 1281.  Cooksey was also complaining of blurry vision.  Tr. 1281.  Dr. Misak recommended that she see a neurologist.  Tr. 1281.

On July 24, 2015, Cooksey met with social worker Maria Mars, LISW, for a counseling session.  Tr. 1395-1398.  She last attended a mental health session in April 2014.  Tr. 1396. Therapy was ended back in 2014 because Cooksey felt she had met her therapy goals.  Tr. 1397. During her July 2015 session, Cooksey indicated that her life was out of control; she was overwhelmed with stress; she was in the process of adopting a baby; she was having financial problems; and her husband was diagnosed with PTSD and he had mental health issues.  Tr. 1395. Cooksey also complained of back pain, rating her pain an 8 on a scale of 0-10, with 10 being the worst.  Tr. 1395.  On examination, Ms. Mars observed that Cooksey was restless, impulsive, depressed, anxious, and irritable.  Tr. 1395.  Cooksey's recent and remote memory was within normal limits; her attention and concentration were sustained; her insight and judgment were fair; and her thought process was logical and organized.  Tr. 1395.  She had a full affect.  Tr. 1395.  Ms. Mars diagnosed depressive disorder and panic attacks.  Tr. 1397.  Ms. Mars assigned a GAF score of 51-60.[6]  Tr. 1397.

On July 31, 2015, upon Dr. Misak's referral, Cooksey saw Dr. Hariprasad Kunhiveedu, M.D., for a neurological consultation regarding her complaints of double vision.  Tr. 1389-1394. Cooksey also complained of weakness when climbing stairs and weakness in her upper extremities but no shortness of breath, muscle wasting or fasciculations.  Tr. 1390.  Dr.

---

[6] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.* With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

Kunhiveedu noted a possible diagnosis of generalized myasthenia gravis and ordered an EMG. Tr. 1393.

Cooksey saw Ms. Mars on September 8, 2015, for counseling. Tr. 1380-1382. Cooksey was struggling to regulate her mood. Tr. 1390. She was feeling overwhelmed and was having trouble sleeping. Tr. 1380. She was tearful throughout the counseling session. Tr. 1380. Cooksey's second grader was being home schooled. Tr. 1380. Cooksey's spouse and older son were disorganized and not willing to help and do their share of chores. Tr. 1380. On mental status examination, Ms. Mars observed that Cooksey's behavior was cooperative but anxious; her thought process was logical and organized; her judgment and insight were fair; her recent and remote memory were within normal limits; her attention span and concentration were sustained; her mood was depressed, anxious, and irritable; and her affect was full. Tr. 1381. Ms. Mars' impression was that Cooksey's symptoms remained unchanged; she remained depressed; and she had significant new stressors. Tr. 1381-1382.

On September 9, 2015, Cooksey underwent the recommended EMG to investigate for myasthenia gravis and myopathy. Tr. 1415. The EMG concerned Cooksey's right upper and lower extremities. Tr. 1415. The EMG showed findings that were most suggestive of right median mononeuropathy at or distal to the wrist, mild to moderate in degree electrically and no evidence of myasthenia gravis or myopathy was identified. Tr. 1415. On September 14, 2015, Cooksey saw Dr. Kunhiveedu for follow up. Tr. 1631-1637. Cooksey complained of diffuse body ache, knee pain bilaterally, stiffness, fatigue, and depression. Tr. 1633. Dr. Kunhiveedu's impression was depression with possible fibromyalgia. Tr. 1636. Dr. Kunhiveedu referred Cooksey to the Physical Medicine and Rehabilitation ("PM&R) Department at MetroHealth and recommended that Cooksey follow up with psychiatry. Tr. 1636.

On September 17, 2015, Cooksey met with Margaret Blasse, PCNS, for a mental health assessment update and medication management.  Tr. 1445-1451.  Cooksey complained that she was getting overwhelmed, crying and having panic attacks.  Tr. 1446.  Cooksey reported many stressors, including being unemployed, disabled husband/marital stress, adoption of a 6 month old, and little support.  Tr. 1446.  After Cooksey stopped working at the bank, she tried to start a daycare but it did not work out.  Tr. 1447.  She continued to care for two children and perform house cleaning for one woman.  Tr. 1447.  She was interested in restoring furniture and trying to resell it.  Tr. 1447.  Cooksey's reported pain in her hips, ankles, back, shoulders, and hands and indicated that her pain level was a 5-10 on a scale of 1-10.  Tr. 1449.  Cooksey reported problems with her attention and concentration and with her memory.  Tr. 1450.  On examination, Cooksey was depressed, anxious, irritable, crying and her affect was constricted.  Tr. 1450.  Nurse Blasse diagnosed major depression, recurrent, moderate and anxiety, NOS.  Tr. 1450.  Nurse Blasse assigned a GAF score of 51-60.  Tr. 1451.  She adjusted Cooksey's medications, recommending that Cooksey taper and stop Zoloft because Cooksey reported that it was not helping her mood enough; start Cymbalta, and continue clonazepam.  Tr. 1451.

On November 6, 2015, Cooksey saw Dr. Misak for follow up regarding her medical problems, including mild persistent asthma, fibromyalgia, obstructive sleep apnea and depression.  Tr. 1441-1442.  Dr. Misak noted that Cooksey's asthma and depression were stable.  Tr. 1442.  Cooksey was scheduled for a PM&R appointment for fibromyalgia and she was scheduled for a sleep study for her sleep apnea.  Tr. 1442.

Cooksey saw Nurse Blasse again on November 11, 2015.  Tr. 1430-1440.  As far as significant life changes/updates, it was noted that Cooksey's grandmother had passed away and Cooksey had to get rid of her pigs due to complaints from a neighbor.  Tr. 1431.  Cooksey

reported she was crying less with Cymbalta.  Tr. 1432.  Her mood was mellow; not real happy but not crying.  Tr. 1432.  She relayed that crowds were overwhelming for her.  Tr. 1432. Cooksey's anxiety attacks had improved but she was still experiencing them a couple times each week.  Tr. 1432.  Cooksey reported fibromyalgia pain, noting pain in her back, shoulders, and hands.  Tr. 1433.  She rated her pain as a 6-7 on a scale of 10.  Tr. 1433.  Nurse Blasse increased Cooksey's Cymbalta and decreased her clonazepam.  Tr. 1433.

Also, on November 11, 2015, Cooksey saw Ann Harrington, CNS, in the PM&R department concerning fibromyalgia and Cooksey's complaints of pain in her spine, leg, feet, forearm/elbow, neck and bilateral shoulder pain.  Tr. 1423-1428.  Cooksey also complained that she was not sleeping well and was constantly fatigued.  Tr. 1424.  Cooksey relayed that she was a stay at home mom and sometimes babysat or cleaned homes.  Tr. 1424.  Nurse Harrington noted 16 out of 18 tender points and her impression was that Cooksey presented with chronic pain syndrome consistent with fibromyalgia syndrome.  Tr. 1428.  Nurse Harrington prescribed gabapentin.  Tr. 1428.  Nurse Harrington recommended water therapy and weaning off of hydrocodone because she did not recommend opiates for treatment of chronic non-malignant pain.  Tr. 1428.

Cooksey saw Nurse Harrington again on December 23, 2015.  Tr. 1684-1690.  Cooksey felt that the gabapentin was helping but it made her very sleepy.  Tr. 1685.  She reported falling asleep while bathing in the tub and falling asleep while eating.  Tr. 1689.  Cooksey was continuing to take Cymbalta.  Tr. 1685.  Cooksey recalled having taken Lyrica in the past but could not remember why it was stopped.  Tr. 1685.  Cooksey felt that the water at the Y was too cold for water therapy.  Tr. 1685.  Taking hot baths helped Cooksey with her pain.  Tr. 1689. Nurse Harrington discontinued the gabapentin, started Cooksey on Lyrica, and continued

Cymbalta.  Tr. 1689.  Since Cooksey felt that water was too cold for water therapy, Nurse

Harrington recommended yoga.  Tr. 1689.

On February 6, 2016, Cooksey sought treatment at the express care clinic for left arm

pain that started two weeks prior.  Tr. 1695-1699.  The pain was starting at her left wrist and

radiating to her elbow.  Tr. 1695.  Cooksey relayed that she had a history of carpal tunnel

syndrome but did not wear her braces.  Tr. 1695.  On examination, Cooksey exhibited tenderness

in her left shoulder but normal range of motion.  Tr. 1698.  She had no tenderness or swelling in

her left wrist, upper arm, forearm or hand and normal range of motion in her left hand.  Tr. 1698.

Normal sensation and strength were noted.  Tr. 1698.  Diagnoses included carpal tunnel

syndrome of the left wrist and left shoulder strain.  Tr. 1698.  Cooksey's arm was wrapped and

she was advised to wear her brace once she returned home and found it.  Tr. 1698.  Tylenol and

Naproxen were recommended for pain.  Tr. 1698.

On February 23, 2016, Cooksey saw Nurse Harrington for follow up.  Tr. 1706-1711.

Cooksey relayed that she had stopped taking Lyrica a week prior because of drowsiness and an

irritable mood.  Tr. 1706.  She was either sleeping too much or not at all.  Tr. 1706.  She was

continuing to take Cymbalta.  Tr. 1706.  Due to a virus, Cooksey had stopped taking her

medication, including her Klonopin.  Tr. 1706.  After being off her Klonopin for a few days,

Cooksey had a panic attack.  Tr. 1706.  She then took a Klonopin and fell asleep in a store.  Tr.

1706.  Hot baths were helping but she reported falling asleep in the tub both the prior evening

and morning of her appointment with Nurse Harrington and she was not taking Lyrica at the

time.  Tr. 1706.  If she was having a good day, she was trying to stretch but would end up in

more pain.  Tr. 1706.  Nurse Harrington discontinued Lyrica and added Zanaflex.  Tr. 1711.  She

continued Cymbalta and recommended yoga since Cooksey felt the water was too cold for water therapy.  Tr. 1711.

Cooksey saw Nurse Blasse on March 8, 2016.  Tr. 1716-1719.  Cooksey relayed family and marital stressors.  Tr. 1718.  She indicated she had pain almost every day.  Tr. 1718.  She was taking a muscle relaxer which helped but not with the pain.  Tr. 1718.  Cooksey was getting things done slowly.  Tr. 1718.  Cooksey's husband did not help with the baby.  Tr. 1718.  She described herself as grumpy and not happy.  Tr. 1718.  She did not laugh and was getting annoyed with her husband and adult step son.  Tr. 1718.  Cooksey felt depressed but did not have suicidal thoughts.  Tr. 1718.  She enjoyed redoing furniture and knitting a little.  Tr. 1718.  She had stopped taking Lyrica due to fatigue.  Tr. 1718.  On examination, Nurse Blasse observed that Cooksey was cooperative and adequately groomed; her speech was spontaneous and rambling; her thought process was logical but a little circumstantial; her mood was depressed and grumpy; her affect was partially constricted and briefly tearful; and her judgment and insight were fair. Tr. 1718.  Cooksey reported difficulty with attention/concentration and difficulty with recent and remote memory.  Tr. 1718.  Nurse Blasse diagnosed major depression, recurrent, moderate and anxiety, NOS.  Tr. 1719.  Nurse Blasse increased Cooksey's Cymbalta and continued her then current dose of clonazepam.  Tr. 1719.

Cooksey underwent a sleep study on March 11, 2016.  Tr. 1724-1729.  The study showed that Cooksey's moderate obstructive sleep apnea was controlled on a CPAP machine.  Tr. 1727-1728.

On April 5, 2016, Cooksey saw Nurse Harrington Tr. 1759-1765.  Cooksey reported that the Zanaflex had helped some but was wearing off in 2-3 hours.  Tr. 1761.  She had recently increased her Cymbalta.  Tr. 1761.  She was not sleeping well so she was sleepy during the day

and was napping frequently during the day.  Tr. 1761.  Cooksey planned to follow up regarding her recent sleep study.  Tr. 1761, 1765.  On examination, Nurse Harrington observed mildly decreased range of motion in all cervical and lumbar planes; negative straight leg raise bilaterally; and reflexes, sensation, strength, and fine motor coordination were normal.  Tr. 1764. Cooksey was able to heel and toe walk without difficulty.  Tr. 1764.  Cooksey exhibited 16 out of 18 tender points.  Tr. 1764.  Nurse Harrington continued to assess chronic pain syndrome consistent with fibromyalgia syndrome increased Cooksey's dose of Zanaflex.  Tr. 1765.

On April 13, 2016, Cooksey saw Nurse Blasse again.  Tr. 1770-1773.  Cooksey continued to report marital problems.  Tr. 1771, 1772.  She relayed that they were losing their house.  Tr. 1772.  She felt she needed to go back to work but her husband was not willing to watch the one-year old child.  Tr. 1772.  Cooksey reported problems with attention/concentration and memory.  Tr. 1772.  On examination, Cooksey was cooperative.  Tr. 1772.  Her mood was angry, sad and hurt.  Tr. 1772.  Her affect was constricted and she cried intermittently.  Tr. 1772. Her thought process was logical but a little circumstantial and her speech was spontaneous and rambling.  Tr. 1772.  Nurse Blasse continued Cooksey on Cymbalta and clonazepam but recommended that Cooksey slowly cut back on clonazepam.  Tr. 1773.

On April 22, 2016, Cooksey sought treatment at an express care clinic because she was having numbness and tingling in her hands and legs below her knees and weakness in upper and lower extremities; she was dropping items, unable to walk straight, and hit the curb twice while driving; she was slurring her speech (per her son); and she was experiencing changes in vision, dizziness, drowsiness, and palpitations.  Tr. 1778.  She was very sleepy and drowsy on examination.  Tr. 1778.  The express care clinic physician was concerned about the possibility of a CVA and advised Cooksey to proceed to MetroHealth's emergency room department for

16

further evaluation.  Tr. 1781.  As directed, Cooksey's son took her to the emergency room.  Tr. 1784-1806.  While at the emergency room, Cooksey indicated she had not been sleeping and had been taking more clonazepam than prescribed.  Tr. 1787.  It was noted that Cooksey needed a CPAP machine.  Tr. 1786.  A physical examination revealed mostly normal findings.  Tr. 1786.  The emergency room assessment was medication side effect and sleep apnea.  Tr. 1787.  Cooksey was advised to cut back on the clonazepam and to get a CPAP machine.  Tr. 1787.

On April 27, 2016, a comprehensive sleep evaluation was performed.  Tr. 1807-1815.  The evaluation showed moderate obstructive sleep apnea responding to CPAP.  Tr. 1812.  A CPAP was ordered.  Tr. 1812.  Cooksey was advised not to drive and she was counseled about driving sleepy.  Tr. 1812.

On May 20, 2016, Dr. Misak authored a letter, stating that, "[d]ue to [Cooksey's] medical condition, Ms. Cooksey should not work and should not drive until further notice."  Tr. 1469.

On June 7, 2016, Cooksey saw Nurse Harrington for follow up.  Tr. 1828-1834.  Cooksey was continuing to take Zanaflex and Cymbalta.  Tr. 1830.  Cooksey reported doing well that day and overall she stated she "does not feel worse[]" and was happy with those results.  Tr. 1830.  She was waiting on a CPAP machine, trying not to nap during the day, and had slept through the night on some nights.  Tr. 1830.  Nurse Harrington continued to observe 16 out of 18 tender points and mildly decreased range of motion in cervical and lumbar planes.  Tr. 1833.  Nurse Harrington continued Cooksey on Cymbalta and Zanaflex and discussed sleep hygiene.  Tr. 1834.

On June 14, 2016, Cooksey appeared for a counseling appointment with Ms. Mars.  Tr. 1839.  When called for her appointment in the waiting room, Cooksey was asleep and did not respond.  Tr. 1839.  Cooksey explained she had taken medication for her knee pain and

17

apologized.  Tr. 1839.  Due to Cooksey being sedated, it was agreed that she would reschedule her appointment.  Tr. 1839.  Cooksey's son was with her and agreed to drive her home.  Tr. 1839.  Cooksey rescheduled her appointment with Ms. Mars for June 23, 2016.  Tr. 1839, 1843-1849.  During that appointment, Cooksey discussed problems at home, including feeling unsupported and overwhelmed with responsibilities at home.  Tr. 1844-1845.  Cooksey's mood was noted to be stable that day and she was appropriate and engaging in the therapy process.  Tr. 1845.  On mental status examination, Cooksey was observed to be cooperative; her judgment and insight were fair; her memory was within normal limits; her attention span and concentration were sustained; her fund of knowledge was okay; her thought process was logical and organized; her speech was spontaneous with a normal rate and flow; her mood was depressed, anxious and irritable; and she had a full affect.  Tr. 1845.  Ms. Mars indicated that no changes were need to Cooksey's treatment plan at that time.  Tr. 1846.

Cooksey saw Nurse Blasse on July 15, 2016, for medication management.  Tr. 1854-1861.  Cooksey relayed that she and her husband were separating, they were losing their home, and she was considering a move out of state with her parents.  Tr. 1855, 1856.  Cooksey was using the CPAP machine but reported that she was still waking up every two hours.  Tr. 1856.  Nurse Blasse observed that Cooksey's mood was drained, overwhelmed and depressed.  Tr. 1856.  Cooksey's affect was partially constricted and tearful.  Tr. 1856.  Cooksey reported problems with attention/concentration and memory.  Tr. 1856.  Her speech was spontaneous and rambling.  Tr. 1856.  Her thought process was logical but a little circumstantial.  Tr. 1856.  Nurse Blasse observed that Cooksey's mood was still negative but sounded a little better since Cooksey had a plan for her and her children.  Tr. 1857.  Nurse Blasse continued Cooksey on Cymbalta and clonazepam and added Melatonin to be used as needed for sleep.  Tr. 1857.

Cooksey saw Dr. Misak on August 16, 2016.  Tr. 1862-1868.  She reported using the CPAP machine for about 3 hours each night but she was still feeling extremely fatigued and falling asleep easily.  Tr. 1862.  Dr. Misak recommended that Cooksey try to use the CPAP machine for 7 hours each night.  Tr. 1863.  Dr. Misak also noted that Cooksey should minimize her use of clonazepam because of the sedating effect but noted that doing so was difficult because Cooksey was under a lot of stress due to her marital problems.  Tr. 1863-1864.

On September 1, 2016, Cooksey was seen at the Center for Sleep Medicine for a sleep disorder follow-up visit.  Tr. 1869-1873.  Cooksey relayed that she was using the CPAP machine sporadically.  Tr. 1870.  She was removing the mask during sleep and not putting it back on and she felt warm with the mask on.  Tr. 1870.  Nasal pillows were ordered to help with use of the CPAP machine and it was recommended to Cooksey that she affix the mask strap to her hair with a hair clasp so she would be alerted if she pulled the mask off during her sleep.  Tr. 1871.

Cooksey saw Nurse Blasse on September 9, 2016.  Tr. 1875-1878.  Cooksey relayed that her husband had moved out.  Tr. 1877.  She was sleeping better and her mood was a little better but she was still feeling anxious and having anxiety attacks.  Tr. 1877.  She was having a lot of pain.  Tr. 1877.  She was working with a realtor to sell the house.  Tr. 1877.  She was unable to drive due to fatigue.  Tr. 1877.  Her son was driving.  Tr. 1877.  Cooksey indicated that she might need to stop taking her medication and look for work because she was not sure her parents could financially support her and her kids.  Tr. 1877.

On September 16, 2016, Cooksey saw Dr. Misak.  Tr. 1883-1888.  Cooksey indicated that the medication she was taking for her fibromyalgia and depression caused drowsiness but she could not function without them.  Tr. 1883.  She was divorcing her husband and was considering moving out of state with her parents.  Tr. 1883.  She was using the CPAP machine

but still having daytime drowsiness.  Tr. 1883.  On examination, Cooksey was anxious and tearful.  Tr. 1883.  Dr. Misak recommended that Cooksey continue with her current treatment for her medical conditions.  Tr. 1884.

Cooksey saw Dr. Misak again on October 25, 2016.  Tr. 1889-1894.  Cooksey relayed that she was working part-time as a cashier at Pat Catan's but her pain was making it difficult for her to get through a shift.  Tr. 1889.  Dr. Misak added Naproxen to Cooksey's fibromyalgia medication regiment to address her worsening pain.  Tr. 1890.

### 2.  Opinion evidence

#### a.  Treating

Dr. Misak completed a Treating Source Statement – Physical Conditions.[7]  Tr. 1465-1468.  Dr. Misak listed Cooksey's diagnoses as including fibromyalgia, degenerative joint disease of cervical and lumbar spine, asthma and carpal tunnel syndrome.  Tr. 1465.  He opined that Cooksey would be off work more than 25% of the time due to her symptoms interfering with the attention and concentration required to perform even simple work-related tasks; she would be absent from work more than four days per month; she could rarely, meaning 1%-5% of an 8-hour workday, lift or carry less than 10 pounds, and she could never lift 10 pounds or more.  Tr. 1465-1466.  Dr. Misak also opined that Plaintiff could sit for a total of 2 hours in an 8-hour workday; stand for a total of 1 hour in an 8-hour workday; and walk for a total of 1 hour in an 8-hour workday, and would need the option to sit or stand at will.  Tr. 1466.  Dr. Misak opined that Cooksey could occasionally reach, handle, finger, feel, push/pull; she could frequently use foot controls bilaterally; and she could never engage in postural activities.  Tr. 1467-1468.  Dr. Misak opined that Cooksey could never work around unprotected heights, moving mechanical parts,

---

[7] The statement is undated but bears an electronic time/date stamp of January 4, 2017, at the top.  Also, the statement is difficult to read.

humidity and wetness, extreme temperatures, dust/odors/fumes/pulmonary irritants, or

vibrations.  Tr. 1468.  He opined Cooksey could operate a vehicle occasionally.  Tr. 1468.

### b.  Consultative

On June 24, 2015, Cooksey saw Mitchell Wax, Ph.D., for a consultative psychological

evaluation.  Tr. 1271-1276.  Cooksey indicated she was unable to work because of panic attacks,

depression, and medical problems.  Tr. 1271.  Cooksey explained that her husband and two

minor children received social security disability benefits and she received income from

babysitting a one-year old.  Tr. 1272.  Cooksey lived with her husband, 17 and 6 year-old

children, a 19 year-old and the 19 year-old's three month old baby, who Cooksey was in the

process of adopting, and her 20 year-old stepson.  Tr. 1272.  Cooksey indicated that she had no

psychiatric hospitalizations, and was not then receiving psychiatric care, but she had seen a

therapist in the past and was receiving antidepressants from her physician. Tr. 1272.

Cooksey indicated that daily activities included cooking for her family, doing laundry,

sweeping floors, taking care of five dogs, cleaning a bird cage, caring for a three-month old

child, and babysitting a one-year old.  Tr. 1273.  She stated "I have to be cleaning constantly, I

have to be doing something constantly."  Tr. 1273.  Cooksey indicated that she went shopping

weekly with her children and she could go shopping on her own.  Tr. 1273.  Cooksey relayed

that she really enjoyed crocheting and needle point, which she did daily.  Tr. 1273.  Cooksey

reported having no friends and a poor relationship with her husband.  Tr. 1273.  The only person

she was close to was her 17 year-old son.  Tr. 1273.

On mental status examination, Cooksey was depressed and agitated and she fidgeted and

cried often.  Tr. 1274.  Dr. Wax noted that Cooksey was very interested in discussing her

medical problems and seemed upset by not being able to go into great detail about her problems.

Tr. 1274.  Dr. Wax observed frequent inconsistencies with respect to Cooksey's statements.  Tr. 1274.  For example, he noted that Cooksey complained of carpal tunnel syndrome but indicated that she crocheted and did needle point daily and had no difficulty holding a pen to sign a release form.  Tr. 1272, 1274.  Also, Cooksey complained of chronic pain but reported being very active throughout the day, i.e., she took care of a 3-month-old, a 1-year-old, a 6-year-old, five dogs, eight or nine exotic birds, and cleaned constantly, and the only time she was observed to be in physical distress was when she stood up to walk out of the evaluation.  Tr. 1274.  Dr. Wax noted that Cooksey's speech was logical, coherent and goal directed but she was often vague and circumstantial and she was frequently over inclusive with medical information and difficult to cut short and redirect.  Tr. 1274.  Dr. Wax indicated that Cooksey appeared depressed, easily frustrated and annoyed, anxious, fretful, and fidgety.  Tr. 1274.  Cooksey indicated she had crying spells and two to three panic attacks per week.  Tr. 1274.  Dr. Wax indicated that Cooksey appeared to be functioning in the low average to average range of intelligence.  Tr. 1274.  He noted that Cooksey's ability to concentrate was intermittent and her flow of conversation and thought was marginal because she distorted questions and did not answer directly.  Tr. 1274.

Dr. Wax diagnosed Cooksey with personality disorder, NOS; major depression; and generalized anxiety disorder.  Tr. 1275.  Dr. Wax noted that Cooksey was able to understand, remember and carry out instructions to take care of children, animals and do household chores but she would not be able to understand, remember and carry out instructions at a job due to her impairments.  Tr. 1275.  Dr. Wax opined that Cooksey would have difficulty maintaining attention and concentration at a job, and she would not respond appropriately to supervisors or coworkers.  Tr. 1276.  Finally, Dr. Wax opined that Cooksey would not respond appropriately to work pressures, indicating that she stated she was easily overwhelmed, appeared overwhelmed

during the evaluation, and indicated she was getting overwhelmed at work the prior year.  Tr. 1276.

### c.    Reviewing

*Physical Impairments*

On August 14, 2015, state agency reviewing physician Gerald Klyop, M.D., completed a physical RFC assessment, opining that Cooksey could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and push and/or pull unlimitedly, other than shown, for lift and/or carry.  Tr. 699.  Dr. Klyop opined that Cooksey would be able to occasionally stoop, crouch and crawl.  Tr. 699.  Dr. Klyop opined that Cooksey would need to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.  Tr. 700.  Dr. Klyop found no manipulative, visual or communicative limitations.  Tr. 699-700.

On December 28, 2015, upon reconsideration, state agency reviewing physician Teresita Cruz, M.D., completed a physical RFC assessment, reaching the same opinions as Dr. Klyop.  Tr. 717-718.

*Mental Impairments*

On July 22, 2015, state agency reviewing psychologist Paul Tangeman, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 696-697) and mental RFC assessment (Tr. 701-704).  In the PRT, Dr. Tangeman opined that Cooksey had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration.  Tr. 697.

In the mental RFC assessment, Dr. Tangeman opined that Cooksey had no understanding and memory limitations but that she had limitations in the areas of sustained concentration and persistence; social interaction; and adaptation.  Tr. 701-704.

With respect to sustained concentration and persistence limitations, Dr. Tangeman opined that Cooksey had moderate limitations in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 701-702.  Dr. Tangeman further explained this limitation, stating that Cooksey retained the capacity to perform simple, repetitive tasks in settings without demands for fast pace or high production.  Tr. 702.

With respect to social interaction limitations, Dr. Tangeman opined that Cooksey had moderate limitations in her ability to interact appropriately with the general public.  Tr. 702.  Dr. Tangeman further explained Cooksey's social interaction limitations, stating that Cooksey retained the capacity for occasional superficial social interactions.  Tr. 702.

With respect to adaptation limitations, Dr. Tangeman opined that Cooksey had moderate limitations in her ability to respond appropriately to changes in the work setting.  Tr. 703.  Dr. Tangeman further explained this limitation, stating that Cooksey could adapt to minor and infrequent changes in the work setting.  Tr. 703.

Upon reconsideration, on December 23, 2015, state agency reviewing psychologist Katherine Fernandez, Psy.D., completed a PRT (Tr. 714-716) and mental RFC assessment (Tr. 719-721).  Dr. Fernandez (Tr. 714-716, 719-721) reached the same conclusions as Dr. Tangeman (Tr. 696-697, 701-704).

24

C.      **Lay person evidence**

In January 2017, Cooksey's adult son and husband submitted letters to the Social

Security Administration in support of Cooksey's application for disability benefits.  Tr. 871, 872-

874.

D.      **Hearing testimony**

1.      **Plaintiff's testimony**

Cooksey testified and was represented at the hearing.  Tr. 646, 647-676, 677-678.

Cooksey explained that her alleged disability onset date corresponds to the date of her accident

in October of 2014.  Tr. 653-654.  At the time of the accident, Cooksey had some day care

children in the vehicle with her and she was hit from behind.  Tr. 654.  She and one of the

children in the vehicle were treated at the hospital.  Tr. 654-655.  Cooksey was advised that she

might have a concussion which should be watched and she was sent home.  Tr. 655.

When asked what prevented her from working, Cooksey first addressed her physical

problems, stating she has a lot of pain in her lower back and indicating she has fibromyalgia

which causes pain throughout her whole body.  Tr. 651.  She stated her pain level depends on the

day and what she is doing and can be anywhere from a 4 to a 10.  Tr. 651-652.  When Cooksey

worked her seasonal job at Pat Catan's, it was hard for her to stand.  Tr. 667-668.  Although she

was not supposed to use one, she used a stool to try to take some weight off of her back.  Tr.

667-668.  Also, her doctor prescribed her a brace to help support her back.  Tr. 667.  At the time

of the hearing, Cooksey was not receiving physical therapy but she had previously.  Tr. 655.  She

uses a back brace when she goes out.  Tr. 655.  She does not use a cane or crutches.  Tr. 655-656.

Cooksey uses a TENS unit as often as she can and she uses Lidocaine patches.  Tr. 670-671.

Cooksey takes a lot of medications.  Tr. 656.  She feels they help but they make her very drowsy.  Tr. 656.  She had been told by her doctor that she should not drive because her medications make her so drowsy she might fall asleep.  Tr. 656.  Cooksey could not say how far she could walk but indicated she could stand for a few hours.  Tr. 656.  She is able to bend, stoop and squat but it hurts.  Tr. 656.  She can sit about an hour.  Tr. 657.  She can lift 10-15 pounds.  Tr. 657.  Cooksey has asthma for which she takes medication.  Tr. 658-659.  She uses a CPAP machine at night for her sleep apnea but not every night.  Tr. 659, 671.  She goes to bed around 11:00 p.m. and wakes three or four times during the night.  Tr. 660.  Cooksey also has carpal tunnel.  Tr. 672.  She wears wrist braces at night.  Tr. 672-673.

With regard to her mental health issues, Cooksey indicated that her biggest issue is her anxiety, which can cause her to break down and cry.  Tr. 663.  For example, when she was working at the bank, she would get overwhelmed and have to leave her desk and go hide.  Tr. 664.  There was a nursing room at work for women and she would go in there to hide until she was over her panic attack.  Tr. 664.  Sometimes her panic attacks would last 10 minutes and one day she had a panic attack that lasted almost 45 minutes.  Tr. 664.  Sometimes she would have to leave work early because of her anxiety or call off sick from work.  Tr. 664-665.  For her mental health issues, Cooksey indicated she was seeing "Dr. Blasey"[8] every three months and also seeing a counselor.  Tr. 657, 675.  Cooksey can follow a television program.  Tr. 657-658.  She does not have a computer at home but uses her phone if she needs a computer because she has an

---

[8] "Blasey" was spelled phonetically in the hearing transcript.  Tr. 657.  The medical records reflect that Cooksey was seeing Margaret Blasse, a nurse, for mental health medication management.  Tr. 1445-1451.  Cooksey referred to Ms. Blasse as a psychiatrist and later stated "[s]he's the therapist, one of the psychologists, whatever you want to call her."  Tr. 657, 675.

internet connection through her phone.  Tr. 658.  Cooksey starts to get uncomfortable when she is in a crowd of more than 10 people.  Tr. 658.

Cooksey is able to take care of showering and dressing by herself.  Tr. 660.  She cooks and does housework, including laundry and shopping, when she feels like it.  Tr. 660-661. Sometimes Cooksey walks to the grocery store which is a block or two from her house and she uses a cart with wheels to bring the groceries home or she uses a backpack if the items are small. Tr. 674.  Her children, ages 19, 8 and 2 live with her.  Tr. 661.  She gets her 8-year-old daughter off to school and helps her with her homework.  Tr. 661-662.  Cooksey has to change her 2-year-old's diapers because he is not potty-trained.  Tr. 661.  Once she gets her daughter off to school, she can rest when her son goes down for a nap.  Tr. 662.  Cooksey likes to do crafts with her daughter.  Tr. 662-663.  She likes to crochet but her hands go numb.  Tr. 673.

### 2.    Vocational expert's testimony

Vocational Expert Charlotta Ures[9] ("VE") testified at the hearing.  Tr. 676-684.  The VE described Cooksey's past work to include the following positions: (1) mailing machine operator, a medium, skilled position; (2) file clerk, a light, semi-skilled position; (3) electronic funds transfer coordinator, a light, skilled position, performed by Cooksey at the sedentary level; (4) transfer clerk, a light, skilled position, performed by Cooksey at the sedentary level; and (5) trust operations assistant, a light, skilled position, performed by Cooksey at the sedentary level.  Tr. 678.

The ALJ asked the VE to consider a hypothetical individual of the same age and with the same vocational and educational background as Cooksey who is limited to light exertional work with additional non-exertional limitations – no climbing of ladders, ropes or scaffolds;

---

[9] The VE's last name is also spelled "Ewers" in the record.  *See e.g.*, Tr. 615.

occasional climbing of ramps, stairs, balancing, stooping, kneeling, crouching and crawling; frequent handling and fingering; no concentrated exposure to temperature extremes, humidity or environmental pollutants; no exposure to hazards, specifically heights, machinery, and commercial driving; and the individual can perform simple, routine tasks in a low stress environment, specifically no fast paced, strict quotas or frequent duty changes; and with superficial interpersonal interactions, specifically no arbitration, negotiation or confrontation. Tr. 679.  The VE indicated that the described individual would be unable to perform Cooksey's past work but there would be light, unskilled jobs available in significant numbers that the individual could perform, including mail clerk, warehouse checker, and office helper.  Tr. 679-680.

Next, the ALJ asked the VE to consider the first hypothetical with the additional limitation that, due to symptoms associated with medically determinable impairments, the individual would be off task at least 20% of the time.  Tr. 681.  The VE indicated that there would be no jobs available for the described individual.  Tr. 681.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his March 6, 2017, decision, the ALJ made the following findings:[10]

---

[10] The ALJ's findings are summarized.

1.    Cooksey met the insured status requirements through December 31, 2019. Tr. 618.

2.    Cooksey had not engaged in substantial gainful activity since October 8, 2014, the alleged onset date.  Tr. 618.

3.    Cooksey had the following severe impairments: disc disease with osteoarthritis of the spine, fibromyalgia, depressive disorder, anxiety disorder, personality disorder, asthma with sleep apnea, hypertension, and history of carpal tunnel syndrome.  Tr. 618-619.  Cooksey also had a non-severe impairment of status post remote concussive syndrome.  Tr. 619.

4.    Cooksey did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 619-622.

5.    Cooksey had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except for no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; frequent handling and fingering; no concentrated exposure to temperature extremes, humidity, or environmental pollutants; no exposure to hazards (heights, machinery, commercial driving); and mental limitations that she perform simple, routine tasks in a low stress environment (no fast pace, strict quotas, or frequent duty changes) involving superficial interpersonal interactions (no arbitration, negotiation, or confrontation).  Tr. 622-635.

6.    Cooksey was unable to perform any past relevant work.  Tr. 635-636.

7.    Cooksey was born in 1967 and was 47 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 636.

8.    Cooksey had at least a high school education and was able to communicate in English.  Tr. 636.

9.    Transferability of job skills was not material to the determination of disability.  Tr. 636.

10.   Considering Cooksey's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Cooksey could perform, including mail clerk, warehouse checker, and office helper.  Tr.  636-637.

Based on the foregoing, the ALJ determined that Cooksey had not been under a disability from October 8, 2014, through the date of the decision.  Tr. 637.

## V. Plaintiff's arguments

Cooksey argues that the RFC is not supported by substantial evidence.  Doc. 12, pp. 13-19.  Also, she argues that the ALJ erred in weighing opinions of Dr. Misak, her treating physician, and Dr. Wax, a consultative examining psychologist.  Doc. 12, pp. 19-24.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's

decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

## A.    Cooksey has not shown that the RFC is not supported by substantial evidence

Cooksey argues that the RFC, indicating that she is capable of a reduced range of light work, is not supported by substantial evidence.  Doc. 12, pp. 13-19.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).   Further, a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability.  20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304.[11]   To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  SSR 16-3p, 2017 WL 5180304, * 5-8.  In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered.  *Id.* at *7-8.  Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms.  *Id.*  "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor

---

[11]  SSR 16-3p replaces SSR 96-7p and applies to rulings on or after March 28, 2016.  *See* 2017 WL 5180304, at *1, 13.

and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported

by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir.

2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

 In arguing that the RFC is not supported by substantial evidence, Cooksey first contends

that the ALJ did not properly consider and/or failed to consider objective medical evidence, e.g.,

evidence of disc herniation, torn meniscus, carpal tunnel syndrome, and evidence regarding side

effects associated with and the effectiveness of the various medications she was taking for both

her physical and mental impairments.  Doc. 12, p. 14.  The ALJ did not ignore objective medical

evidence and diagnoses documenting Cooksey's various physical impairments.  Tr. 624-628.

For example, the ALJ discussed MRI results showing cervical disc herniations (Tr. 625); an x-

ray showing meniscus tear (Tr. 626); and nerve conduction results which were consistent with

carpal tunnel syndrome (Tr. 626).   In formulating Cooksey's RFC, the ALJ considered this

evidence along with other evidence in the record, which included generally normal physical

examination findings.  Tr. 630.  Additionally, the ALJ discussed evidence indicating that

Cooksey's pain medication was very sedating and/or that various medications were not helpful.

Tr. 625 (detailing the various medications that Dr. Misak tried Cooksey on); Tr. 627 (noting

Cooksey reported significant side effects associated with Lyrica and gabapentin).  Considering

the foregoing, the undersigned finds that Cooksey has not shown that the ALJ failed to consider

evidence and her argument amounts to a request that the Court try the case *de novo*, which is not

the role of this Court.  *Garner*, 745 F.2d at 387 (It is not for this Court to "try the case *de novo*,

nor resolve conflicts in evidence, nor decide questions of credibility.").

 Second, she argues that the ALJ improperly placed too much emphasis on the lack of

objective findings because the severity of fibromyalgia cannot be confirmed by objective clinical

testing.  Doc. 12, pp. 14-16.  As indicated by the Sixth Circuit, while "fibromyalgia is an unusual impairment in that its symptoms are often not supportable by objective evidence . . . a *diagnosis* of fibromyalgia does not automatically entitle [a claimant] to disability benefits[.]"  *Vance v. Comm'r*, 260 Fed. Appx. 801, 806 (6th Cir. 2008) (unpublished) (emphasis in original).  Here, when assessing Cooksey's RFC, the ALJ did not solely consider objective clinical testing.  The ALJ considered other evidence when finding that the limitations associated with Cooksey's fibromyalgia were not as disabling as Cooksey alleged.  For example, the ALJ considered that Cooksey reported some improvement of her fibromyalgia pain with medication, hot baths and massage.  Tr. 630; *see* 20 C.F.R. § 404.1529(c)(3) (when assessing a claimant's credibility, consideration is properly provided to the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms and treatment, other than medication, received for relief of pain or other symptoms).  Cooksey does not challenge the ALJ's finding that the record demonstrates some improvement in her symptoms with Zanaflex and other alternative courses of action.  She argues only that several medications failed and that Zanaflex, the medication which provided some improvement, was extremely sedating. Doc. 12, p. 16 (citing Tr. 561, January 11, 2017, office visit with Nurse Harrington).  The treatment note cited by Cooksey in support of her claim that Zanaflex sedated her to the point of being unable to function is a record that was submitted to the Appeals Council *after* the ALJ issued his decision. Doc. 12, p. 10; *see Foster*, 279 F.3d at 357 (Evidence submitted after the ALJ's decision "cannot be considered part of the record for the purposes of substantial evidence review.").  Furthermore, the cited record does not indicate that Zanaflex was sedating to the point of Cooksey not being able to function.  Tr. 561.  Rather, the record reflects that gabapentin and Lyrica were medications that made her very sleepy.  Tr. 561.  And, Nurse Harrington noted that Zanaflex was

helping and continued to prescribe it.  Tr. 566.   Additionally, in addition to limiting Cooksey to

light work, to account for evidence of tenderness and pain, decreased lumbar range of motion,

occasional decreased strength, and daytime fatigue, the ALJ included multiple postural

limitations, manipulative limitations and environmental limitations in the RFC.  Tr. 630.  The

ALJ also discounted the credibility of Cooksey's allegations regarding the limiting effects of her

impairments, finding that Cooksey's rather extensive activities of daily living detracted from her

allegations of totally debilitating impairment.  Tr. 632.  Cooksey separately argues that the ALJ

improperly considered her activities of daily living when finding her not disabled.  However, as

discussed below, that argument is without merit.

Third, she argues that the ALJ did not properly consider the evidence regarding her

mental health impairments.  Doc. 12, pp. 16-17, 18-19.  The ALJ considered evidence relating to

Cooksey's mental impairments and discussed in detail the mental RFC limitations.  Tr. 631.

Cooksey argues that the ALJ improperly discounted her subjective statements by observing that

she did not start formal mental health treatment until July 2015, months after her alleged onset

date.  Doc. 12, pp. 17-18.  She argues that the delay in treatment is explained because it was not

until her physical pain worsened that her mental symptoms started to spiral.  Doc. 12, pp. 17-18.

This argument amounts to a request that this Court try the case *de novo* and weigh the evidence,

which is not the role of this Court.  Further, when assessing credibility it is proper for an ALJ to

consider treatment received for relief of pain or other symptoms.  20 C.F.R. § 404.1529(c)(3).

Thus, when assessing the credibility of Cooksey's subjective allegations, it was not improper for

the ALJ to consider the treatment Cooksey received, and when that treatment was received.

Cooksey also takes issue with the fact that the ALJ took into account the types of medical

providers that Cooksey saw, i.e., social worker and psychiatric clinical nurse specialist rather

than a licensed psychiatrist or psychologist, arguing that Cooksey saw who MetroHealth assigned her, i.e., at MetroHealth Cooksey was not in charge of who she treated with.  Doc. 12, p. 17.  Even if Cooksey is correct that who she treated with was outside of her control, the fact remains that her mental health conditions did not rise to the level of warranting intervention by a licensed psychiatrist or psychologist and/or emergency or inpatient psychiatric treatment.  Tr. 632-633.  Nor has Cooksey shown that it was improper for the ALJ to rely upon that evidence.

Fourth, Cooksey argues that the ALJ improperly relied upon her activities of daily living when finding her not disabled.  Doc. 12, pp. 17-18.  Cooksey suggests that the ALJ equated her ability to perform various activities with the ability to perform substantial gainful activity.  Doc. 12, pp. 17-18.  However, the ALJ considered more than Cooksey's daily activities in assessing Cooksey's credibility and/or RFC and/or finding her not disabled.  And, as explained above, when assessing the credibility of a claimant's subjective allegations of disabling symptoms, it is appropriate for an ALJ to consider daily activities.  20 C.F.R. § 404.1529(c)(3).  Thus, it was not improper for the ALJ to consider Cooksey's daily activities, which included shopping, doing laundry, cooking, driving occasionally, watching television, using the internet, doing some crafts, providing childcare to her minor children, taking care of pet birds and dogs, and performing some post-alleged onset date work activity as a babysitter, cashier and childcare aide, when assessing the credibility of Cooksey's subjective allegations.  Tr. 632.

Considering the foregoing, the undersigned recommends that the Court find that Cooksey has failed to demonstrate that the RFC is unsupported by substantial evidence.

**B.** **Cooksey has not shown that the ALJ erred in weighing the opinions of Dr. Misak and Dr. Wax**

Cooksey argues that the ALJ erred by failing to give appropriate weight to the opinion of her treating physician, Dr. Misak, and the opinion of the consultative examining psychologist, Dr. Wax. Doc. 12, pp. 19-14.

As indicated above, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c). The ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding[ ] [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id*

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.

*Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Non-treating physicians are not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).  However, the factors under 20 C.F.R. § 404.1527 are utilized when deciding the weight to assign to non-treating medical opinions.  *See* 20 C.F.R. § 404.1527(c)*.

*Dr. Misak*

Cooksey contends that the ALJ erred in weighing the opinion of her treating physician Dr. Misak.  Doc. 12, pp. 19-22.  The opinion at issue is located in the record at Tr. 1465-1468 (Exhibit 11F).  Doc. 12, p. 19 (citing Tr. 1465).  The ALJ specifically discussed and weighed this opinion, stating:

> The record contains several opinions rendered by treating primary care provider James E. Misak, M.D. . . . In an undated opinion, Dr. Misak concluded the claimant can rarely lift and carry less than 10 pounds and never lift and carry 10 pounds, can sit 2 hours, stand/walk 1 hour, requires an option to sit/stand at will, and will be off task more than 25% of the time and absent from work 4 or more days per month (Exhibit 11F).  Dr. Misak opined that the claimant can occasionally reach, handle, finger, feel, and push/pull bilaterally, frequently operate foot controls bilaterally, and never climb, balance, stoop, kneel, crouch, crawl, or rotate the head and neck

> (Id.).  He indicated the claimant can occasionally operate a vehicle, but can never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, dusts/odors/fumes/pulmonary irritants, extreme cold, extreme heat, or vibration (Id.).  Although Dr. Misak has an extensive treating relationship with the claimant, his opinions do not warrant controlling or even great weight, for several reasons.   First, the opinions are inconsistent with Dr. Misak's own treatment records, which contain evidence of elevated blood pressure levels, lower extremity edema, and lumbar tenderness, but consistently clear lungs, intact strength and sensation, a normal gait, and negative straight leg raising (Exhibit 3F, 5F, 7F, 8F, 9F, 13F).  The opinions are also inconsistent with the remaining evidence of record, which indicates generally mild to moderate abnormalities on examination and testing, despite relatively conservative medical treatment (Exhibit lF, 2F, 3F, 4F, 7F, 9F, 13F).  Finally, the opinions are inconsistent with the claimant's rather extensive reported activities of daily living, which includes occasional driving, performing household chores, cooking, and engaging in childcare (Exhibit 5E, 6F, 7E, Hearing Testimony).  For these reasons, the undersigned gives Dr. Misak's opinions little weight.

Tr. 633-634.  Consistent with the Regulations, the ALJ explained in detail the reasons for providing Dr. Misak's opinion less than controlling weight.  Cooksey reargues evidence and attempts to show why Dr. Misak's opinion is consistent with his own records and other evidence of record and/or she argues that the ALJ did not sufficiently explain how the opinion was inconsistent with other evidence of record.   However, as indicated above, it is not for this Court to try the case *de novo*, which is what Cooksey seeks.  Further, the ALJ discussed Cooksey's medical treatment history and other evidence of record in detail and he sufficiently explained his reasons for providing less than controlling weight.  While Cooksey disagrees with the ALJ's weighing of the opinion, she has not shown that those reasons are unsupported by substantial evidence.  Accordingly, the undersigned recommends that the Court reject Cooksey's claim that the ALJ erred in weighing the undated opinion of Dr. Misak.

### *Dr. Wax*

Cooksey also contends that the ALJ erred with respect to the opinion of consultative examining psychologist Dr. Wax.  Doc. 12, pp. 22-24.  The ALJ considered and weighed the opinion of Dr. Wax, stating:

> Consultative examiner Mitchell Wax, Ph.D., opined on June 24, 2015 that the claimant would not be able to understand, remember, and carry out instructions on a job, and would have difficulty maintaining attention and concentration on a job (Exhibit 6F).  Dr. Wax noted that the claimant is able to perform simple tasks and perform multiple steps based on her reported activities of daily living; however, he noted she would not respond appropriately to supervisors and coworkers in a work setting, and would not respond appropriately to work pressures in a work setting (Id.).  The undersigned gives this opinion little weight, as it was based on a one-time examination in which the claimant was vague, did not answer directly, and distorted questions (Id.).  Furthermore, the rather limited opinion is inconsistent with the remaining behavioral evidence of record, which indicates mild to moderate psychiatric abnormalities at most, despite rather limited, conservative mental health treatment (Exhibit 3F, 9F, 13F).  As a result, the opinion warrants little weight.

Tr. 634.  Although not a treating source provider, the ALJ explained the reasons for providing little weight to Dr. Wax's opinion.  Tr. 634.  Cooksey contends that discounting the opinion because it was based on an examination where Cooksey was vague, did not answer questions directly and distorted questions is not logical.  Doc. 12, p. 23.  Further, she argues that Dr. Wax's opinion was generally consistent with treatment notes showing persistent, ongoing mental health symptoms despite medication.  Doc. 12, p. 23.  These arguments amount to disagreements with the ALJ's weighing of the evidence.  Even if substantial evidence or indeed a preponderance of the evidence supports Cooksey's position, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Cooksey has not shown that the ALJ failed to consider relevant evidence or that the ALJ's reasons for providing little weight to Dr. Wax's opinion are unsupported by substantial evidence.   Accordingly, the undersigned recommends that the Court reject Cooksey's claim that the ALJ erred in weighing the opinion of Dr. Wax.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.


Dated: June 7, 2018

_____
Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).